## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THOMAS SIGITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-3140 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court for a Report and Recommendation on Plaintiff Thomas Sigite's Motion for Summary Judgment (d/e 8) and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14).  Sigite appeals from the denial of his application for Supplemental Security Income ("Disability Benefits") under Title XVI of the Social Security Act.  42 U.S.C. §§ 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  For the reasons set forth below, this Court recommends that the decision of the Commissioner should be affirmed.

<u>STATEMENT OF FACTS</u>

Sigite was born on October 13, 1957.  <u>Answer (d/e 6)</u>, attached

<u>Certified Transcript of Proceedings Before the Social Security</u>

<u>Administration (R.)</u>, 168.  He attended school through the eleventh grade

and secured a GED.  R. 40-41.  He previously worked as a construction

worker.  R. 72.  He applied for Disability Benefits on March 29, 2010.

R. 15.  Sigite suffers from status post myocardial infarction (heart attack),

ischemic heart disease, chronic obstructive pulmonary disease (COPD),

status post closed head injury, affective disorder, and anxiety disorder.

R. 15.

On August 1, 2008, Sigite went to the hospital emergency room with

chest pains.  R. 399-400.  Dr. Brian Miller, M.D., determined that Sigite

suffered a myocardial infarction.  R. 399.  Dr. Tony Demartini, M.D.,

performed an angioplasty and placed a stent in one of Sigite's coronary

arteries.  R. 399, 429-30.  Sigite suffered a second myocardial infarction on

August 25, 2008.  R. 451.  Dr. Demartini again performed an angioplasty

and placed a stent in one of Sigite's coronary arteries.  R. 449.

On September 28, 2008, Sigite saw Dr. Mark Savage, M.D. for follow

up after his hospitalizations for his heart attacks.  Sigite reported that he felt

well with minor complaints, had good energy, but was sleeping poorly.

Sigite reported having anxiety from quitting smoking. R. 502. The examination was otherwise unremarkable. Dr. Savage continued Sigite's current medications. R. 502-04.

On February 2, 2009, Sigite saw Dr. Savage again for a medication review. Sigite complained of depression at this time. Dr. Savage diagnosed anxiety of an unspecified type. Dr. Savage prescribed anti-anxiety medication. R. 496-97.

On March 12, 2009, Sigite saw Dr. Raymond Leung, M.D., for a consultative examination. R. 513-16. Sigite reported a history of head trauma and heart attacks. Sigite reported that he was hit by an automobile while he was a pedestrian. R. 513. Sigite reported a loss of taste and smell, decreased short and long term memory, and headaches a few times a week. Sigite reported that the headaches lasted up to half a day and were sometimes accompanied by nausea and vomiting. R. 513. Sigite also reported periodic leg swelling and intermittent severe chest pain. Sigite reported that the pain occurred both at rest and with exertion, and that the pain was relieved by nitroglycerin. R. 513. Sigite reported that he could walk to his mailbox and back to his residence. He also reported that he could "lift 5-10 pounds maximally." R. 513. Sigite could not remember

his exact address and could not remember his Social Security Number. R. 514.

On examination, Dr. Leung observed regular heart rate and rhythm with no murmurs; decreased breath sounds, with no rales, rhonchi or wheezes; normal gate and an ability to walk fifty feet; full range of motion in all joints; normal strength throughout extremities; no muscle atrophy or spasms; and sensation within normal limits. R. 515. Dr. Leung diagnosed a history of head trauma with headaches and memory loss, and a history of heart attacks with chest pain relieved by nitroglycerin. R. 515. Dr. Leung opined that Sigite would have decreased ability to manage funds due to decreased memory. R. 514.

On April 20, 2009, Dr. Frank Jimenez, M.D., prepared a Physical Residual Functional Capacity Assessment of Sigite. R. 523-30. Dr. Jimenez opined that Sigite could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk six hours in an eight-hour workday; and could sit six hours in an eight-hour workday. R. 524. Dr. Jimenez opined that Sigite had no other physical functional limitations. R. 524-30.

On April 30, 2009, psychologist Dr. Joseph Cools, Ph.D., prepared a Mental Residual Functional Capacity Assessment and Psychiatric Review

Technique for Sigite.   R. 531-48.  Dr. Cools opined that Sigite was moderately limited in his ability to understand, remember, and carry out very short and simple instructions; moderately limited in his ability to maintain concentration for extended periods of time; moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and markedly limited in his ability to understand, remember, and carry out detailed instructions.  R. 531.  Dr. Cools opined further that Sigite would be able to learn "1-2 step tasks" and would be able to perform most simple routine tasks on a sustained basis.  R. 533.  Dr. Cools opined that Sigite needed a "low stress" job to avoid problems with concentration and social behavior. R. 533.   Dr. Cools opined that Sigite had mild restrictions on activities of daily living and moderate difficulties in social functioning and in maintaining concentration, persistence, or pace.  R. 545.

On June 14, 2009, Sigite went to the emergency room with chest pain and shortness of breath.  R. 574-83.  The emergency room physicians determined that Sigite had not suffered another heart attack.  A chest X-ray showed that Sigite's heart was normal-sized, and there was no acute infiltrates or chest congestion.  R. 579.  The emergency room physicians

noted that Sigite had respiratory problems including suspected COPD. R. 577.  Sigite was released on June 14, 2009.  R. 575.

On September 27, 2009, Sigite went to the emergency room for chest pain, shortness of breath, and a rash.  The emergency room physicians determined that Sigite did not have a heart attack.  Sigite reported that he had not been using his cardiac medicine as directed.    R. 568-72.

On March 29, 2010, Sigite applied for Disability Benefits.  R. 13.

On April 5, 2010, Sigite saw Dr. August Adams, M.D.  R. 586-88. Sigite was establishing himself as a new patient of Dr. Adams.  R. 586.  On examination, Dr. Adams observed that Sigite's lungs were clear and normal to inspection; and Sigite's heart had a normal rhythm, with no murmurs, gallops, or rubs.  R. 587.  Sigite was negative for any psychiatric symptoms.  R. 586.

On June 28, 2010, Sigite saw Dr. Joseph Kozma, M.D., for a consultative examination.  R. 592-97.  Sigite reported that he suffered a head injury when was hit by a car in 1998 or 1999.[1]  Sigite reported headaches and memory loss.  Sigite also reported that he had two stents put into his heart in 2009.  R. 592.

---

[1] Dr. Kozma states at one point that the accident occurred in 1999, but later states that the accident occurred in 1998 on R. 592-93.

Dr. Kozma found that Sigite's intellectual functioning was intact and his communication was proper. Dr. Kozma stated that Sigite was oriented and exhibited a stable emotional state and normal speech, appearance, and behavior. R. 592-97. Sigite reported that he could walk a block, but he sometimes gets "winded." R. 596. Sigite reported that he could be on his feet ten to fifteen minutes at a time. R. 596. Sigite walked without difficulty and moved about freely during the examination. R. 596. Sigite reported that he had chest pains two to three times a week. Sigite reported that the chest pain sometimes radiated into his left arm. Sigite treated the pains with nitroglycerin, which was effective. Sigite had a cough indicating chronic bronchitis. Dr. Kozma diagnosed mild hypertensive vascular disease, angina responding to medication, status post stent insertion, and coronary artery disease. Dr. Kozma opined that Sigite had no limitations on daily living activities. R. 596.

On July 12, 2010, Dr. Marion Panepinto, M.D., prepared a Physical Residual Functional Capacity Assessment of Sigite. R. 598-605. Dr. Panepinto opined that Sigite could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk six hours in an eight-hour workday; could sit six hours in an eight-hour workday; had no limitations in pushing or pulling; could frequently climb ramps and stairs; could

occasionally climb ladders, ropes, and scaffolds; and needed to avoid extreme cold, extreme heat, fumes, odors, dust, gases, and poor ventilation. Dr. Panepinto opined that Sigite had no other physical functional limitations. R. 599-602.

On August 17, 2010, Sigite saw psychologist Dr. Michael Trieger, Psy.D., for a consultative examination. R. 606-09. Sigite reported that he had been hit by a car in 1998 and that he had suffered a heart attack that required two stints. R. 606. Sigite reported memory loss and social anxiety. R. 607. He moved out to the country to avoid people. He reported having panic attacks coming to Dr. Trieger's office in Springfield, Illinois. R. 606-07.

On examination, Dr. Trieger found intermittent memory lapses and a reserved affect. Dr. Trieger found that Sigite's judgment in social situations was impulsive. R. 608. Dr. Trieger diagnosed Sigite with an adjustment disorder with mixed emotional features based on Sigite's report, and amnestic disorder based on Sigite's report. R. 608. Dr. Trieger assigned a Global Assessment of Functioning (GAF) score of 52.[2] R. 609. Dr. Trieger opined that Sigite could manage his own funds. R. 608.

---

[2] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness. American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35. The American Psychiatric Association

On August 18, 2010, psychologist Dr. Donna Hudspeth, Psy.D., prepared a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique for Sigite.  R. 610-27.  Dr. Hudspeth opined that Sigite was not limited in his ability to understand, remember, and carry out simple instructions; moderately limited in his ability to understand, remember, and carry out detailed instructions; and not limited in his ability to maintain concentration for extended periods of time.  R. 624. Dr. Hudspeth opined that Sigite had mild restrictions on activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  R. 620.  Dr. Hudspeth opined that Sigite could perform jobs involving simple one- and two-step tasks, could relate adequately to supervisors and coworkers, but should not be required to deal with the general public.  R. 626.

On December 10, 2010, psychologist Dr. David Voss, Ph.D., affirmed the opinions of Dr. Hudspeth on reconsideration.  R. 634.  On December 13, 2010, Dr. Calixto Aquino, M.D., affirmed the opinions of Dr. Panepinto on reconsideration.  R. 634.

no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On January 10, 2012, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 36-83.  Sigite appeared in person and with his attorney.  Vocational expert Dennis Gustafson also appeared.

Sigite testified that he lived with his wife in a one-bedroom residence with an unfinished basement.  R. 42-43, 45, 64-65.  Sigite's wife was on Social Security.  R. 44.  Sigite testified that his wife received Disability Benefits.  R. 62-63.  Sigite also had two adult sons and three grandchildren.  The adult children and grandchildren did not live with Sigite. R. 45.

The residence had four or five stairs on the exterior leading to the door.  Sigite testified that he had difficulty using stairs.  Sigite testified that he could only climb about five or six stairs before he became out of breath. R. 44.  Sigite testified that he stopped smoking after he had the heart attacks in August 2008.  R. 44.

Sigite testified that he suffered from headaches and chest pains.  He also experienced problems with his neck and with shortness of breath. R. 45.  He also testified that he had memory problems. R. 46.  Sigite testified that, "I was hit by a car in '90 – or '80."  R. 46.  Sigite testified he was hit after he stopped working as a machinist and before he worked for the City of Roodhouse, Illinois.  R. 47.  Sigite had elsewhere reported to

the Social Security Administration that he stopped working as machinist in 1995 and worked for Roodhouse in 2002 and 2003.  R. 235.

Sigite testified that he got chest pains "a couple of times a day." R. 49.  The pain would last anywhere from a moment to thirty minutes. Sigite testified he took nitroglycerine for the pain about thirty to forty times a month.  Sigite testified that he did not like taking nitroglycerine because it gave him a headache.  R. 50.

Sigite testified that he experienced shortness of breath if he walked short distances, "Well, if I walk to get the mail or something, I get, like halfway, and I just I have to stop because I get short" of breath.   R. 51. Sigite testified that his mailbox was 200 feet from his house.  Sigite testified that he would rest five minutes to catch his breath before resuming his walk to the mailbox.  R. 51-52.  Sigite estimated that he could make two round trips to his mailbox, resting every 100 feet to catch his breath.  After that, he would need a longer rest period.  R. 52.  Sigite testified that he could lift and carry five pounds without any difficulty.  Sigite testified he could lift and carry twenty pounds at most. R. 54.

Sigite testified about his memory problems.  Sigite testified, "I forget everything."  R. 53.  He testified that he needed a written list to go to the grocery even to get two or three things.  He needed help remembering to

take his medication.  He testified his wife helped him with the medication.
R. 53-54.

Sigite testified that he had headaches "almost every day."  R. 55.
Sigite testified that when he had a really bad headache, he had to lie down
for an hour and put a wash rag over his eyes.  He testified that he had
really bad headaches about twice a week.  Reading and watching too much
television caused headaches.  R. 55.

During a typical day, Sigite testified that he got up around 5:00 or
6:00 a.m. and "just sit around and drink some coffee."  R. 56.  He watched
television and talked to his wife.  Sigite then usually took a nap for an hour
or two.  Sigite's wife usually fixed his lunch.  Sigite testified that he dusted
and swept floors, but did not mop, vacuum, wash dishes, or wash laundry.
R. 56-57.  Sigite testified that he did not cook.  R. 59-60.  He testified that
he used to cook, but stopped because, "I lost interest."  R. 60.  Sigite
testified that he left the house about once a week, usually to go grocery
shopping.   R. 58.  Sigite testified that he had one friend, "He comes over
sometimes and talks to me, but not too often."  R. 70.

Sigite testified that his house sat on almost an acre of ground.  R. 65.
He sometimes helped clean up the yard in good weather, but his wife did
most of the yard work including mowing the lawn.  R. 56.

Sigite testified that his wife did not want him to be outside too long. Sigite testified that he got dizzy if he was out in the heat too long. Sigite testified that cold weather also bothered him. He testified that he "can't hardly breathe when it's real cold." R. 65. Sigite testified that he was also bothered by smoke, fumes and dust. R. 66.

Sigite testified that his moods were, "Up and down." R. 59. He testified that he got along with other people sometimes. He had problems communicating with other people because, "[T]hey don't pay attention to you." R. 59.

Sigite testified that he did not have any hobbies. He used to enjoy hunting and fishing, but stopped "because I don't feel that good anymore." R. 60. He testified that he had not hunted or fished for "a couple of years." R. 60. Sigite testified that he also rode bikes occasionally. He testified he rode a bike about half a block during the summer before the hearing. He testified he rode a bike once or twice the summer before that. R. 63.

Sigite testified that he did not handle stress well. He testified that, "I get all nervous and panic attacks . . . ." R. 61. He testified that a panic attack, "Feels like my chest, pressure on my chest, never – you know, and I get all nervous. Well, yeah, it feels like almost like a heart attack." R. 61. Sigite testified that he could not concentrate when he felt that way. R. 61.

Sigite testified that he drank alcohol a couple of weeks before the hearing. He drank three or four beers at that time. He testified that he drank about twice a month. He usually drank three or four beers at those times. R. 63-64. He testified that he usually took an hour to consume three or four beers. R. 66.

Sigite testified that he used to do volunteer work. He testified that the summer before the hearing he tried to help prepare burgoo soup at the town fair. R. 67-68. Sigite testified that he got too hot and had to go home. R. 68.

The vocational expert Gustafson then testified. The ALJ asked Gustafson,

> Mr. Gustafson, would you then please assume the ability to perform light exertion work with the ability to occasionally climb ramps and stairs, balance, stoop, balance, and stoop, would you please assume no climbing ladders, ropes, or scaffolds, no work in exposure to hazards, such as dangerous machinery and unprotected heights. Would you also please assume the need to avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases, and other environmental irritants. Furthermore would you please assume the ability to perform unskilled work that is routine and repetitive in nature. With these, and only occasional work interaction with co-workers and supervisors, with these limits, would Mr. Sigite be able to perform past work?

R. 73. Gustafson testified, "No." R. 73. Gustafson testified that a person with these limitations and Sigite's age, education, and work experience

could perform housekeeping cleaning jobs such as hotel room cleaning (Cleaning Job).  Gustafson testified that 14,035 such jobs existed in Illinois and 371,375 nationally.  Gustafson testified that such a person could perform production related inspection work.  He testified that 5,385 such jobs existed in Illinois and 127,190 nationally.  R. 74.  Gustafson testified that such a person could perform hand assembly related tasks.  He testified that 17,800 such jobs existed in Illinois and 306,000 nationally.  Gustafson testified that such a person could perform hand packaging.  He testified that 19,088 such jobs existed in Illinois and 315,460 nationally.  R. 74.

Gustafson testified that further limiting the work to only occasional interaction with the general public would not affect the person's ability to perform the identified jobs.  Limiting the work to "goal directed or goal oriented rather than production paced" would eliminate all of the jobs except the Cleaning Job.  R. 75.

Gustafson testified that the person would lose his job if he was absent from work two or more days a month, if he was off-task twenty percent of the day, if he required an extra fifteen minute break every day, or if he required extra supervision of two or three minutes every hour.  R. 76.

Sigite's attorney Donald Hanrahan then posed some hypothetical questions to Gustafson. Hanrahan and Gustafson had the following colloquy during this examination:

> Q. Is the cleaning job a job in which the work process is understanding, remembering, and carrying out one and two-step instructions and processes or is it more detailed than that?
>
> A. There's no such thing as one or two steps. Any job in existence involves more than one or two steps. If you're talking about – if you were to break it out, getting up and deciding to leave a room involves more than two steps technically in terms of brain function, but what we usually go by is simple routine respective, something that is going to be done over and over again without having to be retrained. That would be more accurate description of the jobs that I cited or of that cleaning work.
>
> Q. Would the – if we just broke it down to the instructions themselves for the cleaning job, would that involve more than one or two steps then?
>
> A. With the, certainly the instructions in the learning period. But once the job is learned, there's nothing changing.

R. 77-78. Gustafson testified that none of the jobs he identified in his testimony were rated "SVP 1," except for a small percentage of the production inspection and packaging jobs. R. 78.

The acronym "SVP" stands for "Specific Vocational Preparation." Department of Labor, Dictionary of Occupational Titles (DOT), Appendix C, § II, located at www.occuptionalinfo.org, viewed October 14, 2014. Specific Vocational Preparation means "the amount of lapsed time required by a

typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Id. An SVP 1 designation means a job that requires a short demonstration only to prepare the person to perform the job. An SVP 2 designation means a job that requires anything beyond a short demonstration up to and including one month of instruction to prepare the person to perform the job. Id.

The ALJ then asked Gustafson:

> Mr. Gustafson, the first hypothetical Mr. Hanrahan gave, stand and walk six hours, sit the remainder of the day, lift 20 pounds rarely, 10 to 15 pounds occasionally, carry 10 pounds or less occasionally, understand, remember, carry out one or two-step instructions or work processes, avoid more than superficial work interaction with the general public, occasional work interaction with co-workers and supervisors, goal oriented work, you said that the cleaner fits the cognitive limitations but not the physical limitations?

R. 81. Gustafson responded, "I believe that's correct." R. 81. The ALJ asked some additional questions of Gustafson and the hearing ended.

## THE DECISION OF THE ALJ

The ALJ issued her decision on January 25, 2012. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R.

§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national

economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined that Sigite met his burden at Steps 1 and 2. Sigite had not engaged in substantial gainful activity since his application date of March 29, 2010, and he suffered from the serious impairments of status post myocardial infarction, ischemic heart disease, COPD, status post closed head injury, affective disorder and anxiety disorder.  R. 15. The ALJ determined at Step 3 that Sigite's impairments or combination of impairments did not meet or equal any Listing.  R. 15-18.

At Step 4, the ALJ determined that Sigite had the RFC to perform light work subject to certain additional limitations:  Sigite could occasionally climb ramps and stairs, balance, and stoop; could not climb ladders, ropes, or scaffolding; could not work near hazards such as dangerous machinery or unprotected heights; must avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases, and other environmental irritants; could only perform unskilled work that is routine and repetitive in nature; could only perform work that is goal oriented or directed and could not perform work that is measured by production pace; and must have only occasional work interaction with co-workers, supervisors, and the general public.  R. 18.

The ALJ relied on the opinions of Drs. Panepinto and Hudspeth to support this finding.  R. 19.[3]  The ALJ also stated that Sigite had been treated with conservative measures, and that no physician found that Sigite was "disabled or unable to perform most light duty work."  R. 19.  The ALJ had previously discussed Dr. Trieger's opinions in determining Sigite's mental condition at Step 3 of the Analysis.  R. 18.  In reaching this RFC determination, the ALJ found that Sigite's claims of total disability were not credible.  R. 18.  The ALJ also found that his wife's claims in the written record that Sigite was totally disabled were not credible.  R. 19.  Rather, the ALJ found that the medical evidence did not support the level of disability claimed by Sigite and his wife.  The ALJ also found that Sigite's testimony about his daily activities supported the RFC determination,

> He generally attends to his own personal needs, and he is able to help with household tasks.  He enjoys watching television, he visits with a friend, he works outside in the yard, he helps with a town fair, and he helps his wife grocery shop.  The ability to perform these daily activities is contrary to the allegation of complete and total disability.

R. 18-19.

The ALJ found that the closed head injury limited Sigite to unskilled work that is routine and repetitive in nature.  The ALJ noted that Sigite

---

[3] The ALJ referred to Drs. Panepinto and Hudspeth's opinions by the Social Security Administration reference numbers in the record, 20F, 22F, and 23F.

could hunt and fish after the injury, "[H]e has displayed the acumen necessary to handle fishing gear and load and fire a weapon.  He can perform work at the SVP 2 level."  R. 19.  The ALJ found that Sigite's mental impairments further limited him to goal oriented work rather than production paced work.  R. 19.  After determining the RFC, the ALJ found at Step 4 that Sigite could not perform his past work as a construction worker.  R. 20.

At Step 5, the ALJ found that Sigite could perform a significant number of jobs in the national economy.  The ALJ considered the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 and the testimony of Gustafson that a person with Sigite's age, education, work experience, and RFC could perform the Cleaning Job and that 14,035 such jobs exist in Illinois and 371,375 nationally.  R. 20.  The ALJ concluded that Sigite was not disabled.

Sigite appealed the decision of the ALJ.  On March 18, 2013, the Appeals Council denied Sigite's request for review.  The decision of the ALJ then became the final decision of the Commissioner.  R. 1.  Sigite then filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. In making this review, the Court considers the evidence that was before the ALJ. <u>Wolfe v. Shalala</u>, 997 F.2d 321, 322 n.3 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally his analysis of all relevant evidence. <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence. Sigite does not dispute the findings at Steps 1-3. At Step 4, the RFC determination that Sigite could perform a limited amount of light work is supported by the opinions of Drs. Panepinto, Trieger, Hudspeth, and Kozma. The exertional

limitations are supported by the opinions of Drs. Panepinto and Kozma.

The non-exertional limitations are supported by the opinions of Drs. Trieger
and Hudspeth.

Dr. Hudspeth opined that Sigite could perform jobs that involve
simple one- and two-step tasks. Gustafson opined that the "one- and two-
step" language was not useful.  He opined that a better description was a
job that involved simple routine and repetitive tasks.  Gustafson's opinion
provides substantial evidence to support the ALJ's adoption of that
formulation in the RFC rather than the one- and two-step language.

The determination at Step 5 that Sigite could perform a significant
number of jobs that exist in the national economy is also supported by
substantial evidence.  Gustafson opined that a person with Sigite's age,
education, work experience, and RFC could perform the Cleaning Job.
Gustafson identified a specific job as the Cleaning Job in the Dictionary of
Occupational Titles, Job Number 323.687-014.  This job has a General
Educational Development (GED) rating of R1.  An R1 rating means that to
perform the job, the person must be able to "apply common sense
understanding to carry out simple one- or two-step instructions."  DOT,
Appendix C, § III, located at www.occuptionalinfo.org, viewed October 14,
2014.  The ALJ's determination that Sigite could perform the Cleaning Job

identified by Gustafson is supported by both Gustafson's opinion that the job involves simple, routine, and repetitive tasks and by the Dictionary of Occupational Titles that the Cleaning Job requires understanding and carrying out simple one- and two-step instructions.

Gustafson further opined that 14,035 Cleaning Jobs existed in Illinois and 371,375 existed nationally. The Seventh Circuit has repeatedly held that the availability of 1,000 jobs in the national economy is enough to meet the Commissioner's burden at Step 5. See e.g., Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009); Fast v. Barnhart, 397 F.3d 468, 472 (7th Cir. 2005); Lee v. Sullivan, 988 F.2d 789, 793 (7th Cir. 1993). Substantial evidence supports the ALJ's decision that Sigite was not disabled.

Sigite argues that the ALJ erred in finding that he had the RFC to perform a limited range of light work because Drs. Panepinto and Jimenez opined that Sigite could stand or walk for six hours in an eight-hour workday. The Court disagrees. The ALJ specifically used the term "light work" as defined in Social Security Regulation 20 C.F.R. § 416.967(b). R. 18. Section 416.967(b) states that light work "requires a good deal of walking or standing." The Social Security Administration clarified the amount of walking and standing required by light work, "[T]he full range of light work requires standing or walking, off and on, for a total of

approximately 6 hours in an 8-hour workday." SSR 83-10, at 6. Thus, the opinions of Drs. Panepinto and Jimenez support the ALJ's determination that Sigite could perform light work. There was no error.

Sigite argues that the ALJ erred in finding that Sigite had the RFC to perform simple, routine, repetitive jobs instead of jobs that were limited to remembering and carrying out one- and two-step tasks and instructions. The Court again disagrees. Gustafson testified that the phrase used by the ALJ was a better formulation to describe jobs that a person with this type of non-exertional limitation could perform. R. 77-78. Gustafson's testimony provides substantial evidence to support the ALJ's use of this terminology. Furthermore, the Cleaning Job only requires reasoning skills to carry out simple one- or two-step instructions according to the DOT. Thus, Gustafson's opinion was consistent with the opinions of Drs. Hudspeth and Cools. There was no error.

Sigite argues that the ALJ erred in her RFC determination because Gustafson opined that Sigite could not lift and carry weight required to perform light work. Sigite is incorrect. The ALJ asked Gustafson to assume a person who could perform light work. R. 73. Light work requires the ability to lift and carry twenty pounds occasionally and ten pounds frequently. 20 C.F.R. § 416.967(b). Gustafson opined that such a person

could perform the Cleaning Job. Sigite's attorney asked Gustafson to assume a person who could lift and carry twenty founds rarely and ten pounds occasionally. R. 75-76, 81. Gustafson's responses to the attorney's question did not relate to a person limited to performing light work. Gustafson's responses to those questions are not relevant to Gustafson's opinions regarding a person who could perform the lifting and carrying requirements of light work.

Sigite argues that the ALJ erred in finding that Sigite had the RFC to perform the Cleaning Job because the Cleaning Job has a Specific Vocational Preparation level of 2 instead of 1. Sigite bases this argument on the opinions of Drs. Hudspeth and Cools that Sigite could only perform jobs that were limited to one- and two-step tasks. The Specific Vocational Preparation Level refers to the time needed to learn a job, not the complexity of the job. The General Educational Development rating measures the complexity of the job. The General Educational Development rating for the Cleaning Job has a Reasoning level 1. Such a level only requires the ability to understand and carry out simple one- and two-step instructions. The ALJ's finding that Sigite could perform the Cleaning Job was consistent with the opinions of Drs. Hudspeth and Cools. There was no error.

Sigite argues that the ALJ erred in finding that the Commissioner met her burden at Step 5 because the ALJ concluded that the Cleaning Job identified by Gustafson existed in significant numbers. There was no error. Gustafson opined that over 14,000 of these jobs existed in Illinois. This number of jobs is sufficient to meet the Commissioner's burden at Step 5. Liskowitz, 559 F.3d at 743; Fast , 397 F.3d at 472; Lee, 988 F.2d at 793. Sigite argues that the ALJ did not follow Social Security Rulings SSR 83-12 and 83-14 in making this determination. Those Rulings direct the ALJ to secure opinions of a vocational expert in cases in which non-exertional and exertional limitations do not allow the person to perform the full range of work in one of the general exertional categories, in this case the full range of light work. SSR 83-12, at *2; SSR 83-14, at *4. The ALJ followed these Rulings by securing the testimony of vocational expert Gustafson. The ALJ did not err in finding that the Commissioner met her burden at Step 5.

Sigite argues that the ALJ erred because she did not mention Dr. Leung's consultative examination.  In particular, Sigite argues that the ALJ erred in not mentioning Dr. Leung's opinion that Sigite might have trouble managing funds due to decreased memory. The ALJ is not required to mention every piece of evidence; rather, the ALJ must "provide an 'accurate and logical bridge' between the evidence and the conclusion."

Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008) (quoting Young v. Barnhart, 362 F.3d 995, 1002 (7th Cir. 2004)).  Dr. Leung was conducting a consultative physical examination, not a consultative mental examination.  Dr. Trieger performed the consultative mental examination.  Dr. Trieger concluded that Sigite had only intermittent memory lapses and would not need assistance in managing his funds.  The ALJ gave weight to Dr. Trieger's opinions.  R. 17.  The ALJ's reliance on Dr. Trieger's opinions provided the necessary logical bridge from the evidence to her conclusions even without a mention of Dr. Leung.

The failure to discuss Dr. Leung's physical examination results also was not error.  Dr. Leung's were not materially different than those found by Dr. Kozma on which the ALJ relied.  R. 16.  The Court sees no reversible error in failing to mention Dr. Leung's examination results.

Sigite last argues that the ALJ's credibility finding was patently wrong.  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder, 529 F.3d at 413-14.  The ALJ found that Sigite's testimony about the severity of his condition, and his wife's similar statements, were not credible.  R. 18-19.  Dr. Hudspeth noted that the lack of functionality reported by the claimant concerning his difficulty with memory,

concentration, understanding, and getting along with others was inconsistent with all of the objective medical evidence. Dr. Hudspeth also noted there were inconsistencies between the functions reported by the claimant and objective medical evidence with regard to the physical allegations of the claimant. R. 622. Dr. Hudspeth also indicated that the claimant could respond to structure of normal work routine and could make normal work adaptations and, although dependent, the claimant could make ordinary work-related decisions. R. 626.

Additionally, the ALJ explained that the objective medical evidence did not support this testimony; no physician opined that he was unable to perform light duty work or imposed a weight limit or other limit on his exertional activities; Sigite could attend to his personal needs, enjoyed watching television, and visited with a friend regularly; and Sigite was able to ride a bicycle within the last year. R. 18-19. This evidence also provides support and an explanation for the ALJ's opinion. The Court will not review the ALJ's credibility determination.

Sigite correctly notes that the ALJ misstated part of Sigite's testimony. The ALJ stated that Sigite helped out at a town fair. R. 19. Sigite testified that he tried to help out, but was unable to do so due to the heat. R. 67-68. The ALJ also stated that Sigite testified that he worked

outside in the yard.  R. 19.  This finding somewhat overstates the testimony.  Sigite testified that on good days he helped pick up the yard, but his wife did most of the yard work.  R. 56.  While the ALJ indicated that the claimant testified he had hunted and fished within the past two years (R. 19), the exact testimony of the claimant was misstated.  The claimant testified he had his heart attack four years prior to his testimony at his hearing before the Administrative Law Judge.  R. 43.  With regard to hunting and fishing, he testified that he had not done any hunting and fishing for a couple of years.  R. 60.  Consequently, while the testimony indicated claimant had been hunting and fishing after his heart attack, he had not done so for two years prior to the hearing.  The Court believes that these errors are not sufficient to warrant reversal.  The other evidence cited by the ALJ provides a sufficient basis for the credibility finding.  See Halsell v. Astrue, 357 F. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasoning must be valid as long as enough of  them are, and here the ALJ cited other sound reasons for disbelieving Halsell.") (citations omitted). Even though the ALJ made errors in factual reasons for discrediting the claimant's testimony, if the ALJ relied very little on the credibility finding, but relied upon the doctors' reports in the record, those errors are harmless. Manley v. Barnhart, 154 Fed.Appx. 532, 537-538 (7th Cir. 2005).

WHEREFORE this Court recommends that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) should be ALLOWED, and Plaintiff Thomas Sigite's Motion for Summary Judgment (d/e 8) should be DENIED.  The decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.


ENTER:    January 30, 2015


                    s/ Tom Schanzle-Haskins
                UNITED STATES MAGISTRATE JUDGE